## TRAVER and others *v.* TRIBOU.

## SAME *v.* BROOKS and others.

*(Circuit Court, D. Oregon.* February 12, 1883.)

**1. DIVISION OF DONATION BETWEEN SETTLER AND WIFE.**

The division of a donation to a married man, under section 4 of the donation act of September 27, 1850, (9 St. 497,) between the settler and his wife, is committed by the act to the discretion of the surveyor general, and in contemplation of law is made when the settler proves to the satisfaction of said officer that he has complied with the provisions of the act, and the latter issues the certificate containing the facts constituting such compliance, and specifying the portion of the donation set apart to the husband and that to the wife, as provided in section 7 of said act; and no valid objection thereto is found by the commissioner of the general land-office, which is shown by the subsequent issue of a patent thereon.

**2. SUIT FOR PARTITION—STATUTE OF LIMITATIONS.**

The wife of a married settler, under section 4 of the donation act, died after final proof by the settler of compliance with the act, and before the issue of the patent. *Held,* (1) that the half of the donation to which she was or would have been entitled, was thereupon granted, by the act, to her surviving husband and children in equal parts as the direct donees of the United States; and (2) the statute of limitations did not commence to run against the right of the heirs of said husband to maintain a suit against his vendees of certain distinct portions thereof, for a partition of their interests in said half of said donation, until the same was formally and finally divided by the surveyor general as aforesaid.

Suit for Partition.

*George H. Durham* and *H. Y. Thompson,* for plaintiffs.

*W. F. Trimble* and *Benton Killin,* for defendants.

DEADY, J.   These cases were both heard and submitted on the plea of the statute of limitations to the bill, and will be considered together.   The plaintiffs George W. Traver and Emma S., his wife, are citizens of the state of California, and George A. Graham and Ida M., his wife, are citizens of the state of Ohio.   They bring these suits for the partition of lots 5 and 6, in block 254, of the city of Portland.   The bills were filed on October 16, 1879, and allege that the defendant George F. Tribou is the owner of an undivided one-fifth of the W. $\frac{1}{2}$ of said lots, and the defendants Amasa Brooks, John E. Brooks, and Julia A. Brooks are the owners of a similar fifth of the E. $\frac{1}{2}$ thereof, and that the plaintiffs George W. and Emma S. Traver and Ida M. Graham are the owners of the remaining four-fifths of both lots, in the following proportions: the first of the undivided 82-125 and the last two of 9-125 each.   The pleas allege that the defendants and those under whom they claim have been in the open, actual, and adverse possession of their respective portions of the premises, as the exclusive owners thereof, for more than 20 years before the commencement of these suits.   The pleas are accompanied by answers.   Disregarding the averments of the pleadings, which are mere conclusions of law, the admitted and material facts of the case, as they appear therefrom, are these:

On June 25, 1850, Daniel H. Lownsdale, Stephen Coffin, and W. W. Chapman were in the joint occupation of that portion of the public domain upon which the city of Portland was then partially laid out and has since been built, without any other right thereto than the possession under the laws of the provisional government, when Lownsdale released and quitclaimed to Chapman certain blocks or parcels therein, including block 254, with a covenant of warranty against all persons, the United States excepted, and another, that if Lownsdale should thereafter acquire title to the premises from the United States, he would convey the same to Chapman; and the defendants and those under whom they claim have occupied said lots as the owners thereof under said deed to Chapman and successive conveyances thereunder ever since.

On July 6, 1850, Lownsdale married Nancy Gillihan, a widow with two children, namely, William T. and Isabella E. Gillihan.

On March 11, 1852, Lownsdale filed his notification in the office of the surveyor general upon a certain portion of said public domain, including block 254, as a settler thereon, under the act of September 27, 1850, (9 St. 497,) commonly called the donation act; and on April 8, 1852, he filed in said office his own affidavit and those of two witnesses, showing his marriage to Nancy

as aforesaid; that he was a qualified settler under said donation act; and that the settlement and cultivation of the premises required by the act were commenced by him on September 22, 1848, and continued to that date; whereupon, as it is averred in the pleas, the surveyor general set apart the east half of said tract to Lownsdale, and the west half, including block 254, to his wife Nancy; and that on September 29, 1853, Lownsdale made his final proof to the satisfaction of the surveyor general of four years' residence on and cultivation of the land described in his notification, and of his compliance with the donation act, so as to entitle him and his wife Nancy to a patent therefor.

On April 15, 1854, Nancy died, leaving her husband and four children, namely, Millard O. and Ruth A. Lownsdale, and William T. and Isabella E. Gillihan, aforesaid; and on January 17, 1860, Lownsdale purchased the interest of said Isabella E. in the donation of her mother, and on February 14, 1860, conveyed an undivided two-fifths of the same to Hannah M. Smith.

On October 17, 1860, a patent certificate was duly issued for the donation, wherein the east half thereof was designated as the part inuring to Lownsdale, and the west half as the part inuring to his wife Nancy.

On May 4, 1862, Lownsdale died, leaving James P. O. and Mary, his children by a former wife and the plaintiff, Emma S. Traver, and Ida M. Squires, the children of Sarah Squires, a deceased daughter by said former wife, and Millard O. and Ruth A., his children by Nancy; and on June 6, 1865, a patent was issued by the United States for the donation to the heirs of Lownsdale and his wife—the east half to the heirs of the former, and the west half to those of the latter.

On April 28, 1864, William T. Gillihan brought a suit in the state circuit court for the partition of the west half of the donation, in which the other children of Nancy, and the heirs of Lownsdale, together with many other persons claiming divers blocks and lots therein as the vendees of Lownsdale, were made defendants, including W. W. Chapman, the defendant Tribou, and the immediate grantor of the defendant Amasa Brooks, from whom his co-defendants, John E. and Julia A. Brooks, have long since — November 22, 1877—derived whatever interest they have or claim in the premises; that on May 22, 1865, said court decided that Lownsdale, as the survivor of Nancy and the grantee of her child, Isabella E., was the owner, in his life-time, of an undivided two-fifths of the west half of said donation, and that said William T., Millard O., and Ruth A., as the children of Nancy, were then each the owners of an undivided one-fifth of said half; that on August 12, 1865, said court set apart and allotted to said three children, in severalty, certain portions thereof, and the remainder to the heirs, vendees, or claimants under Lownsdale according to their respective interests, without determining what they were; and because said partition was unequal, it was further adjudged that the children of Nancy should be paid the sum of $39,156.02, to be apportioned among the several parcels of land set apart to the heirs, vendees, or claimants under Lownsdale, as aforesaid—the same to be a lien thereon; that $355.90 of said sum was so apportioned upon said lots 5 and 6; and that thereafter the defendants Tribou and Amasa Brooks paid said owelty.

On February 23, 1869, James P. O. purchased the undivided two-fifths of one-fifth of the west half of the donation from Hannah M. Smith, it being the same two-fifths she had purchased from Lownsdale in his life-time; and afterwards and before the commencement of these suits, all the heirs of Lownsdale, except the plaintiffs Emma S. and Ida M., conveyed their interests in the premises to the plaintiff George W. Traver.

Since September 29, 1849, under the laws of Oregon, an adverse possession of 20 years was sufficient to bar an action by the owner for the possession, until the passage of the act of October 17, 1878, (Sess. Laws, 21,) which limited the time to 10 years; but in all cases where a cause of action had then accrued, and this period had expired or would expire within one year from the passage of the act, an action might be brought within such year.

These suits were brought on the last day of the year following the passage of the act of October 17, 1878, and if they were not barred by lapse of time at the date of such passage—if 20 years had not then elapsed since the plaintiffs' right of suit accrued—it is admitted they were brought within the time allowed by law.

But upon the letter of the statute it appears that even if the right of suit was barred at the date of its passage, it was thereby revived and extended one year therefrom. But I do not understand that the plaintiffs rest their right to sue upon this ground, and the cases will therefore be considered upon the assumption that if on October 17, 1878, the period of 20 years had elapsed from the time the right of suit accrued, the suits are barred.

In the consideration of purely equitable rights and titles a court of equity is not governed by the statute of limitations. But these suits are brought upon the legal title of the plaintiffs, and in the determination of them the limitation applicable to an action at law thereon will be followed. *Hall* v. *Russell*, 3 Sawy. 514; *Manning* v. *Hayden*, 5 Sawy. 379.

When, then, did the plaintiffs' right of suit accrue and when did the statute of limitations commence to run against it? Manifestly the cause of suit must have accrued whenever the plaintiffs, or those under whom they claim, were entitled to the possession of the premises, and to maintain a suit for partition against any person who owned an undivided interest therein; and under the facts as to the possession of the defendants and those under whom they claim, the statute commenced to run against such right as soon as it accrued.

The plaintiffs contend that the right of suit accrued upon the giving of the decree in the partition suit in 1865, under which they claim

to derive title; that the legal operation of the partition was to effect an exchange of distinct parcels of land between the heirs of Lownsdale and the children of Nancy; and that the former took as purchasers from said children and not by descent from their ancestor, and therefore the statute of limitations had not run on October 17, 1878.

At most, the heirs of Lownsdale could only have received three-fifths of block 254 from the children of Nancy by this exchange, for that was all they ever had in it. But I am still satisfied with the ruling upon this point in *Fields* v. *Squires*, 1 Deady, 391. In that case I held that this partition divided the land between the children of Nancy on the one hand and the heirs and vendees of Lownsdale on the other, according to the respective interests of the latter, without attempting to determine what they were, giving to the children in land and owelty what was deemed the equivalent of three-fifths of the premises, and to the heirs and vendees in land charged with the payment of this owelty what was deemed equivalent to two-fifths of the same. To the same effect see *Davenport* v. *Lamb*, 13 Wall. 428. The portions or parcels then ascertained and set apart in severalty to the children of Nancy were in contemplation of law the very three-fifths which they took from the United States under the donation act after the death of their mother, and in like contemplation the remaining two-fifths were the very portion of the premises which the heirs of Lownsdale inherited from him, subject, however, to the legal effect of the acts done and suffered by him concerning the same. Nor was the character or origin of the estate or title of these parties changed or affected by this decree and partition. The heirs of Lownsdale took the two-fifth tract by descent from him, as his heirs, and as such were and are so far bound by his acts and conduct relating to the same, as he would be himself, if living. This was not an exchange of distinct parcels of land owned in entirety by either party, but a separation of undivided interests in a tract theretofore owned by them in common.

The plaintiffs also contend that their right to the possession, and to maintain this suit for partition, did not accrue until the half of the donation inuring to the wife was finally designated in and by the patent issued on June 6, 1865—a little over 14 years before the commencement of these suits. On the contrary, the defendants insist that the right of possession accrued to the plaintiffs, or those under whom they claim, on April 8, 1852, when Lownsdale made the proof, under section 7 of the donation act, of the commencement

of his residence and cultivation, because, as they allege, the surveyor general then divided the donation between the husband and the wife, as required by section 4 of said act, and thereupon the statute of limitations commenced to run against the wife in favor of the defendants' grantors then in the adverse possession of block 254.

The plea and argument of the defendants assume that the children and survivor of Nancy took the west half of the donation as her heirs, and are therefore in privity with her, and bound by her acts or conduct while living, and the wife of the settler, Lownsdale. But the law, so far as this court is concerned, is held otherwise. Upon the death of Nancy, her "share or interest" in the donation was given by section 4 of the act to her husband and children in equal parts, and they took under the donation act as the direct donees of the United States, and not as the heirs of Nancy, whose interest in the premises, whatever it was, terminated with her death. *Fields* v. *Squires*, 1 Deady, 382.

But even if they took as the heirs of Nancy, or in any sense, by, through, or under her, the result, so far as this plea is concerned, must be the same. She was a married woman when the donation act passed, and continued to be one up to the time of her death. All the statutes of limitation ever in force in Oregon, from that contained in the "Steam-boat Act" of September 29, 1849, and taken from the Revised Statutes of Iowa (p. 384) of 1843 down to the present one, have provided that the statute should not commence to run against a married woman during her marriage. It may, then, be taken for granted that whether Nancy's husband and children took the western half of the donation as the direct donees of the United States or as her successors in interest, or that whatever possession those under whom the defendants claim may have had of this property before the death of Nancy, the statute of limitations did not commence to run in their favor until the death of Nancy—April 15, 1854.

Did it commence to run then, and if not, when? On September 29, 1853, the settler, Lownsdale, made his final proof of the residence and cultivation required by the act, and had otherwise conformed thereto, so that according to the construction given to the donation act by the supreme court in *Hall* v. *Russell*, 101 U. S. 503, as soon thereafter as it was ascertained by the proper authority that this proof was sufficient, he became a qualified grantee thereunder, and the right to the one-half of the donation was then vested in him. And, for the same reason, Nancy also became a grantee and entitled to one-half of the donation, provided she did not die before the pat-

ent issued. But she did so die, and thereupon her husband and children became entitled in her place to one-half of the donation. But to what half? and was there yet any division of the donation or official designation of the half inuring to the settler and the one to the wife? The defendants allege in their pleas that this designation was made by the surveyor general on April 8, 1852, when Lownsdale made his preliminary proof or proof of settlement. But, however this may be as a matter of fact, as a matter of law I do not think the division could be formally and finally made before the full compliance with the act by the settler, and proof thereof to the satisfaction of the surveyor-general, as provided in section 7 of the act. Until this was done, the settler had only a possessory right in the land—the right of occupation—and there was no grant or donation to divide between him and his wife. *Hall* v. *Russell, supra,* 503. And any entry or action by the surveyor general on the subject at this time must in the nature of things have been merely provisional, and subject to correction and modification in his final action upon the case, when he came to consider the final proofs, and make up and issue the patent certificate.

Upon the final proof being made, if it was satisfactory, the surveyor general was authorized to issue a certificate, under rules and regulations to be prescribed by the general land-office, "setting forth the facts in the case, and specifying the land to which the parties are entitled." It is understood to have been the practice of the land-office to make this division of the donation upon the issue of the certificates, and then enter the same on the records or plats of the survey in the office, or *vice versa.* It is also understood that the commissioner of the general land-office has, in some cases, exercised the right to alter the division, but probably only with the consent of the parties interested. And upon the assumption that the commissioner was authorized in all cases to review and modify the division made in the local land-office, the plaintiffs base their claim that there was no absolute and final division of the donation until the patent was issued. But I doubt if the commissioner is authorized to set aside the division made by the surveyor general and substitute one made by himself. The authority given him by the act is to issue a patent according to the facts stated in the certificate, one of which is, in case the settler is a married man, the division of the donation between him and his wife, and the designation of the part inuring to each. True, if there is a valid objection to the issue of a patent upon the case made in the certificate he may refuse to do so. But I

think his power is then exhausted, and he must return the certificate to the local office for further proceedings in accordance with his decision. At least, the power to partition the donation between the settler and his wife seems committed to the judgment of the surveyor general, and although he may be required by the direction of the commissioner to exercise this power in a particular case, and to correct errors committed in the exercise of it, as that the donation was not divided into two equal parts, I do not think he could be required to divide it in a particular manner, as by an east and west line rather than a north and south one, or to assign the north or east half to the wife rather than the south or west one. So far as the partition and allotment of the donation between the settler and his wife rests in the discretion of the officer, I think the act commits the matter wholly to his judgment.

Assuming as I do, and as seems to be admitted by the defendants' plea, that a suit for partition could not have been maintained by the plaintiffs' ancestor, Lownsdale, against the defendants for partition of the premises until, by the formal division of the donation, it was ascertained and determined in which half of the same they would be included, it follows that the statute of limitations did not commence to run against the suit until such division was made. When, then, for the purposes of this case, was this division made? On September 29, 1853, when the settler made his final proof, and the matter was submitted to the surveyor general for examination and determination; or on October 17, 1860, the date of the certificate in and by which the division, so far as appears, is first formally made and announced?

In the one case the limitation of 20 years, counting from the filing of the proof, or the death of Nancy on April 15, 1854, had elapsed before the passage of the act of October 17, 1878, and the plaintiffs' right of suit was barred, and in the other the limitation would not have expired until October 17, 1880, and therefore the right of suit was not barred at the passage of said act.

Taking the facts as stated, and the construction of the donation act as announced by Mr. Chief Justice WAITE in *Hall* v. *Russell, supra,* my conclusion is that the share or interest of Nancy in this donation was not ascertained or set apart during her life-time, nor until the patent certificate was issued on October 17, 1860, when and whereby the division was made giving the settler the east half, and the west half to the wife, nominally, but in effect to those whom the act gave it upon her death; and upon this certificate and in accordance therewith the patent subsequently issued.

The right to the patent, as was said by Mr. Justice FIELD in *Starrs* v. *Stark,* 6 Wall. 413, became perfect when the certificate of the surveyor general was received by the commissioner of the general landoffice, and he found no valid objection thereto, and that none was so found is shown by the subsequent issue of the patent thereon. *Barney* v. *Dolph,* 97 U. S. 656. In the division of the donation it appears that the west half was set apart to Nancy, although she was then dead; but such division, being the basis of the patent, would, I suppose, by analogy, inure, under the act of May 20, 1836, (5 St. 31,) to the benefit of the persons to whom the act gave the land in such contingency. See *Starrs* v. *Stark, supra,* 427.

Upon the argument counsel for the defendant also insisted that these suits could not be maintained because the plaintiffs were not in the actual possession of the premises, and suggested that the suits ought to be stayed, at least until the plaintiffs tried their right to the possession by an action at law. It is not apparent how this question can arise on the consideration of these pleas of the statute of limitations. But if it can the answer is very plain. And, *first,* the pleas admit, in effect, that the title to two-fifths of the western half of the donation was in Lownsdale,—one-fifth as the donee of the United States, upon the death of Nancy, and the other fifth as the grantee of her daughter, Isabella E.; that by the partition of the tract in 1865 the whole of block 254 was set apart to the heirs of Lownsdale, subject to the effect of his deed of quitclaim to Chapman of June 25, 1850. And as to that it was held in *Fields* v. *Squires,* 1 Deady, 379, that this deed only passed the bare possession, the title being still in the United States, but that by virtue of the covenant therein for further assurance, in case Lownsdale obtained title from the United States, his heirs were estopped to claim against the grantee in said deed, or those claiming under him, the one-fifth interest therein which he took from the United States on the death of Nancy, but as to the fifth purchased from Isabella E. he was not so estopped; and that Lownsdale's grantee in the deed of June 25, 1850, nor those claiming under him, neither lost nor gained by the partition, and that, consequently, the defendants' interest in the premises is an undivided one-fifth. See *Davenport* v. *Lamb,* 13 Wall. 429.

From this it is plain that the legal title to the undivided four-fifths of these premises is in the plaintiffs, and that they are entitled to maintain these suits for partition unless they are barred by lapse of time.

As was said by this court in *Lamb* v. *Starr*, 1 Deady, 364,—

"The jurisdiction of a court of equity over a suit for partition, so far as I have been able to ascertain, never did depend upon the possession by the complainant. Where the title of the complainant, whether it be legal or equitable, is not doubtful or suspicious, equity will take jurisdiction and decree partition, without reference to the question of possession. But in the case of an alleged legal title, when either of these objections appear, it is usual, first, to send the complainant to a court of law to try his title, and in the mean time retain the bill to await the result. In the case of an equitable title, the court of equity first ascertains the title, and, if found for the complainant, proceeds to make partition." *Wilkin* v. *Wilkin*, 1 Johns. Ch. 117; *Cox* v. *Smith*, 4 Johns. Ch. 276; *Matthewson* v. *Johnson*, Hoff. Ch. 562; 4 Kent, Comm. 364; *Phelps* v. *Green*, 3 Johns. Ch. 304.

In this case the title is neither doubtful nor suspicious. The facts constituting the plaintiff's right are admitted, as are also the facts which it is claimed constitute an adverse possession, sufficient in duration to bar the assertion of such right, and in effect to constitute a title in the defendants.

The only question to be determined—when did the statute commence to run?—is one of law, and may as well be decided in a court of equity as a court of law, for in either case the court must decide it. On the contrary, if the question was one of fact,—as, for instance, the duration or character of the defendant's possession,—and there appeared to be any doubt about it on the evidence, the plaintiff might very properly be directed to try that question in a court of law with a jury. But there can be no good reason for sending a plaintiff in a suit in equity for partition to a court of law to try a mere question of law involved in his claim or the defense thereto, particularly in modern times, when the two courts are composed of the same judges, and former rivalry and jealously between them has become a thing of the past.

The adverse possession of the defendants not having continued 20 years after the statute of limitations commenced to run against the plaintiffs or their ancestor, and before these suits were commenced, the pleas to the bills are considered insufficient and therefore overruled.